Filed 12/8/25  P. v. Rosales CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D082745 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. RIF1500094) |
| CRISTIAN ALFONSO VELASQUEZ ROSALES et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Riverside County, Bernard Schwartz, Judge.  Affirmed in part, reversed in part, and remanded with instructions.

Patricia J. Ulibarri, under appointment by the Court of Appeal, for Defendant and Appellant Cristian Alfonso Velasquez Rosales.

Jill M. Klein, under appointment by the Court of Appeal, for Defendant and Appellant Manuel Barbarin.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Christopher P. Beesley and Britton B. Lacy, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

Cristian Alfonso Velasquez Rosales and Manuel Barbarin drove up to 14-year-old Lareanz Simmons as he was walking home. Barbarin got out of the car and fatally shot Simmons. Prosecutors charged Velasquez and Barbarin with first degree special circumstance murder and sought the death penalty. At the guilt phase of trial, a jury found Velasquez and Barbarin guilty of first degree murder (Pen. Code, § 187, subd. (a)); unlawful possession of a firearm (§ 29800(a)(1)); and active participation in a criminal street gang (§ 186.22(a)). As to the murder charge, the jury also found true special circumstance allegations that Velasquez and Barbarin intentionally killed Simmons because of his race, color, religion, nationality, or country of origin (§ 190.2(a)(16)) and committed the murder while active participants in a criminal street gang and to further gang activities (§ 190.2(a)(22)). In addition, the jury found true gang and firearm sentencing enhancement allegations. (§§ 186.22(b)(1)(C), 12055.53(d) & (e)(1).) At the penalty phase, the jury set the penalty for murder as to both Velasquez and Barbarin at life in prison without the possibility of parole. The trial court sentenced Velasquez and Barbarin each to an aggregate term of life in prison without the possibility of parole plus 25 years to life plus two years.

On appeal, Velasquez and Barbarin present five joint claims, and Velasquez presents six independent claims.

First, Velasquez and Barbarin contend the trial court violated the Fifth and Fourteenth Amendments by admitting Barbarin's statements to police informants elicited during an operation under *Illinois v. Perkins* (1990) 496 U.S. 292 because the statements were (1) elicited through improper custodial interrogation and (2) involuntary. We conclude otherwise.

In their second, third, and fourth claims, Velasquez and Barbarin argue substantial evidence does not support the jury's findings on the hate-crime and gang-murder special circumstance allegations or the gang sentencing enhancements. We agree as to the hate-crime special circumstance allegation against Velasquez but otherwise reject each of these contentions.

Fifth, Velasquez and Barbarin argue the trial court erred by allowing the prosecution's gang expert to testify about the history of the rivalry between the Eastside Riva gang and the 1200 Blocc Crips because the testimony amounted to inadmissible hearsay and an improper opinion on an individual's subjective state of mind. We conclude otherwise.

In his first independent claim, Velasquez contends his right to determine the objective of his defense was violated when his counsel conceded Velasquez was driving the car at the time of the murder. We disagree.

In his second and third independent claims, Velasquez asserts substantial evidence does not support his first degree murder conviction as an aider and abettor or that he possessed a firearm for purposes of his conviction of possession of a firearm by a felon. We find substantial evidence supports these convictions.

Fourth, Velasquez asserts the trial court erred by admitting against him Barbarin's prejudicial statements to the police informants and related gang evidence. We find no error.

Fifth, Velasquez contends the trial court's instructions erroneously allowed the jury to convict him of murder based on a finding of implied malice. We conclude the trial court did not commit instructional error.

Sixth and finally, Velasquez argues the abstract of judgment must be corrected to reflect Velasquez and Barbarin are jointly and severally liable for

3

the ordered victim restitution.  We instruct the trial court to amend the abstracts of judgment to clarify the restitution order.

Accordingly, we reverse in part, strike the special circumstance finding pursuant to section 190.2(a)(16) as to Velasquez, and remand with instructions to amend the abstracts of judgment to reflect the restitution obligation of both Velasquez and Barbarin is joint and several.  We otherwise affirm.

## BACKGROUND

### I.

On February 23, 2012, Velasquez and Barbarin were active members of the Eastside Riva gang.

That evening, 14-year-old Simmons, who was not a gang member, was walking near his home in Riverside.  Velasquez was driving his car with Barbarin in the front passenger seat and another person in the backseat.  When they neared Simmons, Barbarin got out of the car, approached Simmons, and began shooting.  Simmons put his hands up and tried to back away before falling to the ground.  Barbarin struck Simmons in the right shoulder and the back of the head.  Barbarin then got back into Velasquez's car and the men drove away.

Simmons died the following day from the head wound.

### II.

Several hours after the shooting, police stopped Velasquez as he was driving his car, which matched witness descriptions of the suspect vehicle.  During the stop, police took samples from Velasquez's hands for gunshot residue testing.  The sample from the back of Velasquez's left hand tested positive for particles of gunshot residue.

4

III.

Riverside Police Sergeant Chad Collopy investigated Simmons' murder. During the investigation, he conducted an operation under *Perkins* by placing Barbarin in a jail cell with two paid informants who posed as inmates. A video of the conversation between Barbarin and the informants, during which Barbarin implicated himself and Velasquez in the murder, was played for the jury.

Collopy also testified as the prosecution's gang expert. He testified Eastside Riva is a predominantly Hispanic street gang claiming territory on Riverside's east side. Collopy further explained the 1200 Blocc Crips, a predominantly Black gang, claim territory in the same region.

Collopy testified to a longstanding rivalry between Eastside Riva and the 1200 Blocc Crips and explained Eastside Riva members refer to 1200 Blocc Crips members by the derogatory term "snail." When presented with a hypothetical scenario tracking the facts of Simmons' shooting, Collopy testified to his opinion such a crime would have been committed for the benefit of, at the direction of, or in association with Eastside Riva.

ANALYSIS

I.

In their first joint claim, Velasquez and Barbarin assert the trial court's admission of Barbarin's statements to police informants during the *Perkins* operation violated the Fifth and Fourteenth Amendments because Barbarin's statements were (1) the result of improper custodial interrogation and (2) involuntary. We disagree.

A.

The *Perkins* operation took place while Barbarin was in custody on other charges. Police employed two former gang members who worked as

5

paid informants, briefed them on certain details of Simmons' murder and personal information about Velasquez and Barbarin, and placed them in a jail cell. Meanwhile, police caused Barbarin to participate in a ruse lineup, where he was asked to step forward, purportedly to be viewed by someone attempting to identify a suspect. Afterward, Barbarin was placed in the same cell.

The informants engaged Barbarin in conversation about the lineup, the charges they each faced, and mutually known gang members. Eventually, with prodding, Barbarin began to talk about Simmons' murder. Barbarin told the informants he, Velasquez, and a fellow gang member drove up on Simmons. Velasquez was driving, Barbarin was in the front passenger seat, and the third gang member was in the backseat. Barbarin got out of the car and shot Simmons because he believed Simmons was a member of the rival 1200 Blocc Crips. He told the informants he "took care" of the murder weapon, which was "long gone," although it was unclear if he got rid of the gun himself or gave it to Velasquez. Barbarin felt no remorse for killing Simmons.

Before trial, Barbarin moved to exclude his statements to the informants on the grounds the *Perkins* operation amounted to unlawful custodial interrogation and the statements were coerced. The court denied the motion, finding Barbarin's statements admissible because (1) the *Perkins* operation did not implicate Fifth Amendment principles and (2) Barbarin's statements were voluntary.

## B.

The Fifth Amendment privilege against self-incrimination precludes the use at trial of statements obtained from custodial interrogation of a suspect unless the suspect knowingly and voluntarily waived the rights to

6

remain silent, have an attorney present, and, if indigent, have counsel appointed. (*Miranda v. Arizona* (1966) 384 U.S. 436, 444–445.) In *Perkins*, however, the United States Supreme Court concluded a suspect's statements to an undercover agent are admissible notwithstanding the failure to advise the suspect of their *Miranda* rights prior to obtaining the statements. (*Perkins*, 496 U.S. at p. 294.) *Perkins* reasoned that "[c]onversations between suspects and undercover agents do not implicate the concerns underlying *Miranda*" because "[t]he essential ingredients of a 'police-dominated atmosphere' and compulsion are not present when an incarcerated person speaks freely to someone whom he believes to be a fellow inmate." (*Id.* at p. 296.)

Under *Perkins*, the California Supreme Court has repeatedly found the Fifth Amendment does not prohibit the admission of statements made by a defendant to a person whom the defendant does not suspect to be a government agent. (See, e.g., *People v. Fayed* (2020) 9 Cal.5th 147, 165; *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 284; *People v. Tate* (2010) 49 Cal.4th 635, 686.) In addition, in *People v. Mayfield* (1997) 14 Cal.4th 668, our high court applied *Perkins* to find no Fifth Amendment violation where law enforcement surreptitiously recorded a defendant's statements to his father after the defendant had been advised of his *Miranda* rights and had "declined to waive his rights and requested an attorney." (*Mayfield,* at p. 757.) And California courts of appeal have consistently found *Perkins* controls when a suspect invokes his right to counsel but then unknowingly speaks to a police agent. (See, e.g., *People v. Orozco* (2019) 32 Cal.App.5th 802, 815; *People v. Plyler* (1993) 18 Cal.App.4th 535, 544–545.)

We recognize that in November 2024 the California Supreme Court granted review to decide two issues related to the use of *Perkins* operations

after a suspect has invoked the right to remain silent: (1) "If a defendant has invoked his right to remain silent while being interrogated by a law enforcement officer, are incriminating statements obtained through a subsequent *Perkins* operation . . . admissible as substantive proof of the defendant's guilt at trial?" (*Issues Pending Before the California Supreme Court in Criminal Cases* (November 2025) California Supreme Court <https://supreme.courts.ca.gov/sites/default/files/supremecourt/default/2025-11/pendingissues-crim%20-%20112625_0.pdf> [as of Dec. 8, 2025], archived at <https://perma.cc/WU5H-GHXM> [select "View the live page"]) and (2) "What effect, if any, does the fact that the interrogating officer continued questioning after petitioner invoked his Fifth Amendment right to silence have upon the admissibility of the statements subsequently obtained during the *Perkins* operation?" (*People v. Allen*, S286520, Supreme Ct. Mins., Nov. 20, 2024.) These issues are immaterial here, however.

The record does not support Barbarin's claim that he invoked his right to remain silent when police tried to question him about the murder on a prior occasion. There are two references in the record to Barbarin refusing to answer police questioning prior to the *Perkins* operation. First, Barbarin told the confidential informants that at some unspecified time a law enforcement officer tried to question him about an unidentified murder, and he responded, "'I don't want to talk to you no more, dog,'" and "if my [paperwork] don't say murder, then don't talk about nothing." Second, Barbarin's counsel cross-examined Collopy on the subject during the hearing on the admissibility of Barbarin's statements to the informants. During that exchange, Collopy testified that seven months before the *Perkins* operation Barbarin was arrested for a gun offense. Detectives attempted to question Barbarin about Simmons' murder but, according to Collopy, "[t]here was no information

8

gathered." Collopy stated (1) it was "possible" Barbarin invoked his Fifth Amendment right to remain silent but (2) he could not recall. He confirmed, however, that Barbarin refused to talk about Simmons' murder.

Only an unambiguous invocation of the right to remain silent triggers law enforcement's obligation to stop questioning a suspect. (See *People v. Martinez* (2010) 47 Cal.4th 911, 947–949.) At most, the evidence before us shows Barbarin made ambiguous statements about not wanting to talk to police. It does not show Barbarin ever unequivocally invoked his Fifth Amendment right to remain silent so as to prohibit further questioning.

Because this case does not present the scenario under review by our Supreme Court in *Allen*, we need only apply settled law. As stated, our high court has repeatedly applied *Perkins* to reject Fifth Amendment challenges to the admissibility of statements a suspect makes to a person the suspect does not know is a government agent, even after the suspect declines to waive *Miranda* rights and requests an attorney. (See, e.g., *Fayed*, 9 Cal.5th at p. 165; *Mayfield*, 14 Cal.4th at p. 757.) The facts of this case warrant no deviation from this authority.

## C.

The due process clause of the Fourteenth Amendment makes inadmissible involuntary statements obtained from a suspect through police coercion. (*People v. Neal* (2003) 31 Cal.4th 63, 79.) "A statement is involuntary if it is not the product of a rational intellect and free will. The test for determining whether a confession is voluntary is whether the defendant's will was overborne at the time he confessed." (*Fayed*, 9 Cal.5th at p. 165 [cleaned up].)

Coercive police action is a prerequisite to a finding of involuntariness. (*People v. McWhorter* (2009) 47 Cal.4th 318, 347.) "Police trickery," however,

9

"does not, by itself, render a confession involuntary." (*People v. Chutan* (1999) 72 Cal.App.4th 1276, 1280.) When a defendant alleges agents used coercive or deceptive tactics during a *Perkins* operation, we focus on whether those tactics were "the type likely to procure an untrue statement." (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1088.)

On appeal, we examine the uncontradicted facts surrounding the statements and independently determine whether the statements were voluntary. (*People v. Maury* (2003) 30 Cal.4th 342, 404.) To the extent the evidence conflicts, we must accept the version of events most favorable to the prosecution if supported by the record. (*Ibid*.)

Velasquez and Barbarin argue Barbarin's statements to the informants were not freely and voluntarily made because he felt compelled to speak to the informants, who he viewed as being senior gang members exhibiting coercive and threatening behavior toward him. In support, they cite expert testimony they presented at the hearing on their motions to exclude the statements that, given the informants' apparent gang status, Barbarin would have felt compelled to offer details of the crime. They also argue law enforcement's deceptive tactics, such as the ruse lineup, resulted in an interrogation by informants that was tainted by coercive police activity.

First, Velasquez and Barbarin have not established the requisite police involvement in any coercion. At the time of the *Perkins* operation, Barbarin was questioned *only* by the informants. Even if we look to the police tactics employed before Barbarin was placed in the cell, we find no coercive police action. There is no basis to infer that Barbarin being made to participate in a ruse lineup where he was led to believe he was identified as involved in an

unidentified crime was likely to result in making untrue statements about his culpability for Simmons' murder. (See *McCurdy*, 59 Cal.4th at p. 1088.)

Second, Velasquez and Barbarin have not shown Barbarin's statements were involuntary. Videos show Barbarin conversing with the informants freely and easily. Although the informants may have prodded Barbarin, no portion of the conversation suggests any statements or actions by the informants caused Barbarin's will to be overborne. This is not coercion. (See *Fayed*, 9 Cal.5th at p. 166; *People v. Rodriguez* (2019) 40 Cal.App.5th 194, 199.)

## II.

In their second and third joint claims, Velasquez and Barbarin challenge the sufficiency of the evidence to support the special circumstance allegations and the gang sentencing enhancement. We agree insufficient evidence supports the hate-crime special circumstance allegation as to Velasquez but reject the other contentions.

## A.

We review claims of insufficient evidence for substantial evidence. (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) In a criminal case, we review the record in the light most favorable to the judgment to determine whether substantial evidence, i.e. evidence that is reasonable, credible, and of solid value, exists so that a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. (*People v. Collins* (2025) 17 Cal.5th 293, 307.) Similarly, under the federal sufficiency of the evidence standard, we ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319.)

11

We do not reweigh the evidence, assess witness credibility, or choose between competing inferences. (*People v. Stewart* (2000) 77 Cal.App.4th 785, 790.) We must, however, consider the weight of the evidence before deferring to the findings of the trier of fact. (*Collins*, 17 Cal.5th at p. 307.) In doing so, we credit only evidence reasonably inspiring confidence in the verdict. (*Ibid.*) "'Mere conjecture, surmise, or suspicion is not the equivalent of reasonable inference and does not constitute proof.'" (*People v. Anderson* (1968) 70 Cal.2d 15, 24.)

## B.

In their second joint claim, Velasquez and Barbarin contend the evidence was insufficient to support the hate-crime special circumstance allegation because it does not show Simmons' murder was motivated by racial bias. We agree as to Velasquez.

## 1.

Under section 190.2(a)(16), a sentence of death or life without the possibility of parole applies where a defendant is found guilty of murder and the jury finds true the allegation that "[t]he victim was intentionally killed because of his or her race, color, religion, nationality, or country of origin." In this context, "'"because of" means the conduct must have been *caused by* the prohibited bias.'" (*People v. Lindberg* (2008) 45 Cal.4th 1, 38.) "A cause is a condition that logically must exist for a given result or consequence to occur. The bias motivation must be a cause in fact of the offense, whether or not other causes also exist. When multiple concurrent motives exist, the prohibited bias must be a substantial factor in bringing about the crime." (*Ibid.* [cleaned up].) Section 422.87, which requires state and local law enforcement agencies to adopt hate crime policies, is instructive. It defines "bias motivation" as "a preexisting negative attitude toward [certain] actual

12

or perceived characteristics" and may include such things as "hatred, animosity, discriminatory selection of victims, resentment, revulsion, contempt, unreasonable fear, paranoia, [or] callousness." (§ 422.87(a)(3)(B).)

There was a racial component to the murder of Simmons. Velasquez and Barbarin targeted him due to their perception he was a member of the rival 1200 Blocc Crips, a gang Velasquez and Barbarin both despised. But Simmons was not a gang member. Nor was there any evidence he had tattoos or was wearing clothing suggestive of gang membership. And there is no evidence he claimed a gang, either verbally or through hand signs, before Velasquez and Barbarin murdered him.[1] Absent any indicia of gang membership, Velasquez and Barbarin could have misidentified Simmons as a member of the 1200 Blocc Crips based only on the fact he was Black and was present in an area claimed by both Eastside Riva and the 1200 Blocc Crips. Misidentifying Simmons based on his race, however, is not the same as targeting him because of a racial *bias*, as required to support the hate-crime special circumstance allegation. (See *Lindberg*, 45 Cal.4th at p. 38.)

2.

As to Barbarin, additional evidence shows (1) he harbored the requisite racial bias and (2) that bias was at least one causal factor in his decision to shoot Simmons. Barbarin explained to the informants he had a history of shooting rival gang members and was the "main" member of his gang who killed "Tintos," a derogatory term used to refer to Black people. And, while Barbarin denied being a racist and claimed he could "show love to a [B]lack

---

[1] Although Barbarin told the informants Simmons "yelled something out" before being shot, Barbarin did not claim Simmons yelled anything gang-related.

13

person," he repeatedly used a racial slur to refer to Black people and admitted his disdain for "loud" and "hard headed" Black crips gang members.

Viewed in the light most favorable to the judgment, this evidence was sufficient for a rational trier of fact to find Barbarin killed Simmons "because of" his race. (§ 190.2(a)(16); *Lindberg*, 45 Cal.4th at pp. 38, 40–41.)

3.

Unlike Barbarin, there is no evidence showing Velasquez shared Barbarin's racial bias, let alone that it was a substantial factor motivating him to kill Simmons. The evidence shows Velasquez held himself out as a "snail" killer and suggests that, after the shooting, he wanted to continue shooting at members of the 1200 Blocc Crips. And, as explained, Velasquez and Barbarin could have only mistaken Simmons for a rival gang member because he was Black. But none of this evidence suggests Velasquez harbored racial *bias* against Simmons or any actual member of the 1200 Blocc Crips. Contrary to the evidence against Barbarin, there is no evidence Velasquez used racial slurs, killed "tintos," or disliked "loud" and "hard headed" Black crips gang members. Viewed in the light most favorable to the judgment, this evidence shows Velasquez participated in the crime for a gang-related purpose but not because of racial animus.

Accordingly, the hate-crime special circumstance allegation against Velasquez must be reversed. Because the record is insufficient as to this issue, the Double Jeopardy Clause bars retrial of this allegation against Velasquez. (*People v. Hin* (2025) 17 Cal.5th 401, 468.)

III.

In their third joint claim, Velasquez and Barbarin argue the evidence is insufficient to support the jury's true finding as to the gang-murder special circumstance allegation because it does not show Eastside Riva received more

14

than a reputational benefit from the crime and because Barbarin had a personal motivation for the crime rather than an intent to further gang activities. For the same reasons, they contend in their fourth joint claim the evidence is insufficient to support the gang sentencing enhancement. As to the gang enhancement, they further argue the evidence does not show they committed the crime with the specific intent to promote, further, or assist criminal conduct by gang members. We disagree.

A.

The gang-murder special circumstance provision of section 190.2(a)(22) allows for imposition of the death penalty or a term of life imprisonment without the possibility of parole if "[t]he defendant intentionally killed the victim while [he] was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang." In turn, section 186.22(f) defines a "criminal street gang [a]s 'an ongoing, organized association or group of three or more persons, . . . whose members collectively engage in, or have engaged in, a pattern of criminal gang activity.'" (*People v. Lopez* (2022) 82 Cal.App.5th 1, 11.) A "pattern of criminal gang activity" is defined as the commission of predicate offenses under particular circumstances, which "have 'commonly benefited' the alleged gang." (*Id.* at pp. 11–12.)

In addition, section 186.22(b) sets forth various sentencing enhancements for persons convicted of felonies "committed for the benefit of, at the direction of, or in association with a criminal street gang." These sentencing enhancements "apply only to gang-related crimes, meaning offenses 'committed for the benefit of, at the direction of, or in association with a criminal street gang'" and "require 'the specific intent to promote, further, or assist in criminal conduct by gang members.'" (*Lopez*,

15

82 Cal.App.5th at p. 12.) Evidence that a gang member intended to commit a crime, intended to commit it with a fellow gang member, and knew his associate was a member of his gang is sufficient to show the specific intent to promote, further, or assist in criminal conduct by gang members. (*People v. Morales* (2003) 112 Cal.App.4th 1176, 1198–1199.)

As stated in section 186.22(g), and applicable to both the gang special circumstance under section 190.2(a)(22) and the sentencing enhancements under section 186.22(b), "the terms 'benefit,' 'promote,' 'further,' and 'assist' are now defined to mean providing 'a common benefit to members of a gang where the common benefit is more than reputational.'" (*Lopez*, 82 Cal.App.5th at p. 12.) "Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, *targeting a perceived* or actual *gang rival*, or intimidation or silencing of a potential current or previous witness or informant." (§ 186.22(g), italics added.)

The element of the gang-murder special circumstance "that the murder was carried out to further the activities of the criminal street gang" (§ 190.2(a)(22)) substantially parallels the language of section 186.22(b)(1). (*People v. Carr* (2010) 190 Cal.App.4th 475, 488.) Thus, a court may look to the same types of evidence to inform its sufficiency of the evidence analysis regarding a perpetrator's intent to further gang activities under both provisions. (See *id.* at pp. 488–489.)

B.

The trial evidence showed Velasquez and Barbarin committed the crime with the intent to further the activities of Eastside Riva because their actions were directed at a perceived gang rival, even if Barbarin also had a separate personal motive.

16

Specifically, there was an intense rivalry between Eastside Riva and the 1200 Blocc Crips. Eastside Riva members wrote graffiti boasting of killing "snails." Velasquez and Barbarin each joined in this hatred of their rivals from the 1200 Blocc Crips. Velasquez had a tattoo identifying himself as a "snail" killer, and Barbarin boasted to the confidential informants of the satisfaction he felt from murdering members of the 1200 Blocc Crips. As to Simmons' murder, Barbarin told the informants Simmons "banged" and was from his "[e]nemy 1200 block," which is "why [Barbarin] gave it to him." He also told them Velasquez wanted to continue the shootings after Simmons was killed, presumably to continue targeting their gang rivals. When presented with a hypothetical scenario tracking these facts, Collopy testified it was his opinion such a crime would have been committed for the benefit of, at the direction of, or in association with Eastside Riva.

The evidence that Velasquez and Barbarin together targeted Simmons because they perceived him to be a gang rival is sufficient to establish (1) the Eastside Riva gang benefited from Simmons' murder in more than a reputational way and (2) they intended to promote, further, or assist in criminal conduct by gang members as to support both the gang-murder special circumstance allegation and the gang sentencing enhancement. (*People v. Romero* (2006) 140 Cal.App.4th 15, 18–19; § 186.22(g).)

IV.

In their fifth and final joint claim, Velasquez and Barbarin contend the trial court erred by allowing the prosecution's gang expert to testify about, what he referred to as, the Tiny Dukes conspiracy because the testimony constituted inadmissible hearsay and an improper expert opinion on an individual's subjective state of mind. We reject this claim.

17

A.

Collopy testified to the historical background of the rivalry between Eastside Riva and the 1200 Blocc Crips, including the Tiny Dukes conspiracy. According to Collopy, prior to 1990, Eastside Riva and the 1200 Blocc Crips tolerated each other. But other gangs were entering the east side of Riverside to sell drugs, which upset both gangs. Members from a subset of Eastside Riva known as the Tiny Dukes met with the 1200 Blocc Crips and decided to jointly target the outside gangs. Members of the Tiny Dukes and 1200 Blocc Crips then set out together and shot at members of the outside gangs but did not hit anyone.

When the Mexican Mafia learned the Tiny Dukes were cooperating with the 1200 Blocc Crips, they ordered Tiny Dukes members be murdered unless they agreed to commit assaults against the 1200 Blocc Crips. The Tiny Dukes complied with the order to assault members of the 1200 Blocc Crips, prompting the 1200 Blocc Crips to retaliate against the Tiny Dukes. Eventually, members of the two gangs started targeting any perceived member of the rival gang based on an individual's race, regardless of actual gang membership.

During this testimony, Velasquez and Barbarin objected on the grounds of hearsay and lack of foundation and pursuant to *People v. Sanchez* (2016) 63 Cal.4th 665. After multiple defense objections, the trial court heard argument on the issue outside the jury's presence. The court ruled (1) *Sanchez* did not apply to the testimony at issue because it did not involve case-specific facts and (2) the testimony was admissible expert testimony regarding the background of Eastside Riva based on Collopy's training and experience that would form the basis of his expert gang opinion.

18

At the close of trial, the court issued a limiting instruction with respect to Collopy's testimony.  Specifically, the court stated that, in reaching his conclusions as an expert witness, Collopy "considered statements made by law enforcement, gang members, and others" and instructed the jury it was to "consider those statements only to evaluate the expert's opinion" and was not to "consider those statements as proof that the information contained in the statements is true."

B.

Expert witnesses "may relate information acquired through their training and experience, even though that information may have been derived from conversations with others, lectures, study of learned treatises, etc."  (*Sanchez*, 63 Cal.4th at p. 675.)  "When giving such testimony, the expert often relates relevant principles or generalized information rather than reciting specific statements made by others."  (*Ibid.*)  Authority for this practice is codified in Evidence Code section 801(b), which provides an expert witness generally may testify "[b]ased on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the" expert "that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates."  Similarly, Evidence Code section 802 provides, in part, that an expert generally "may state on direct examination the reasons for his opinion and the matter (including, in the case of an expert, his special knowledge, skill, experience, training, and education) upon which it is based."  An expert may not, however, relate case-specific facts to the jury if the expert has no independent knowledge of those facts.  (*Sanchez*, at p. 676.)

We review the trial court's admissibility determination and any ruling regarding exceptions to the hearsay rule for an abuse of discretion.  (*Bowser*

19

*v. Ford Motor Co.* (2022) 78 Cal.App.5th 587, 610.)  Under this standard, our task is to determine whether the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner.  (*Ibid.*)

C.

The trial court did not abuse its discretion by allowing Collopy's testimony regarding the Tiny Dukes conspiracy.  The testimony was relevant to establish the nature of the rivalry between Eastside Riva and the 1200 Blocc Crips so as to support Collopy's opinion Simmons' murder benefited the Eastside Riva gang by targeting a perceived gang rival.  The testimony did not relay any case-specific facts.  Nor did it expand beyond permissible background information based on Collopy's training and experience to an opinion regarding anyone's specific state of mind.  (See *People v. Mendez* (2019) 7 Cal.5th 680, 694.)  Given this and the instruction limiting the jury's consideration of this information, the court acted within its discretion.

V.

In his first independent claim, Velasquez argues he was denied his right to determine the objective of his defense when his counsel conceded he was driving the car despite his desire to maintain his innocence.  We are unpersuaded.

A.

In opening statements, one of Velasquez's trial counsel, Joseph W. Galasso, highlighted Barbarin's admission that he, not Velasquez, was the shooter and explained no evidence would show Velasquez even knew Barbarin had a gun.  Galasso continued by explaining, "[s]o as far as [Velasquez] knew, when he suddenly stopped the car, and [Barbarin] got out,"

20

it was merely to check out Simmons, "rough him up a little bit," "hit him," or "[m]ess with him a little bit."

During a subsequent in camera hearing, Velasquez's second trial counsel, Julie Swain, moved for a mistrial because Velasquez insisted on "assert[ing] his innocence a hundred percent and not conced[ing] any issues in opening statement." Galasso explained he did not discuss with Velasquez the intention to concede he was the driver and that concession was not specifically agreed to by counsel. Galasso further explained he was "t[aken] aback" by the prosecutor's assertion during his opening statement that Velasquez was the shooter and "felt that [he] could not sit back and fail to respond with what the evidence was going to show and what came out in the *Perkins* operation." "[S]o [he] made a tactical decision at that moment to . . . remind the jury what the evidence is going to show"—Valasquez "was not the shooter based on what Mr. Barbarin said" but instead "was the driver."

The trial court denied the motion, finding (1) Galasso made a permissible tactical decision to concede Velasquez was the driver and (2) there was no prejudice in light of the evidence and jury instructions.

## B.

Some decisions related to fundamental trial rights are so significant they cannot be made on a defendant's behalf. Where those decisions are at issue, counsel must obtain the defendant's consent for the recommended course of action following consultation. (*Florida v. Nixon* (2004) 543 U.S. 175, 187.) Defendants have a right to determine the objective of their own defense, including to maintain innocence, falls within this category. (*McCoy v. Louisiana* (2018) 584 U.S. 414, 422.) Counsel's decision to concede a defendant's guilt against that defendant's wishes is error that is not subject

21

to harmless error review but is instead reversible per se. (*People v. Bloom* (2022) 12 Cal.5th 1008, 1042.)

Yet while a defendant maintains the right to determine what the "objectives in fact *are,*" it is counsel's prerogative to make "strategic choices about how best to *achieve* a client's objectives." (*McCoy*, 584 U.S. at p. 422.) Thus, "[t]rial management is the lawyer's province: Counsel provides his or her assistance by making decisions such as 'what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence.'" (*Ibid.*)

We review de novo whether a defendant's constitutional right to determine the objective of his or her defense was violated. (*People v. Palmer* (2020) 49 Cal.App.5th 268, 280.)

C.

Here, unlike the cases Velasquez relies on to support his claim, counsel did not concede guilt, or even any element of the crimes charged. Rather, counsel acknowledged Barbarin's statement that Velasquez was the driver at the time of the shooting and explained Velasquez was innocent despite this evidence because he did not know Barbarin was going to commit the crime. During closing arguments, Velasquez, through counsel, maintained his innocence based, in part, on this same theory. As the jury was instructed, mere presence at the scene and failure to prevent a crime is insufficient to prove guilt as an aider and abettor. (CALCRIM No. 401.) By offering the jury a theory by which it could find Barbarin's statement true and still acquit Velasquez, counsel was honoring Velasquez's objective of maintaining his innocence while making strategic decisions about what arguments to make to best achieve that objective given the evidence presented. Counsel's statement did not run afoul of *McCoy*.

## VI.

Velasquez argues in his second independent claim that the evidence was insufficient to support a finding that he intended to kill as an aider and abettor and, thus, the trial court erred by denying his motion for judgment of acquittal under Penal Code section 1118.1 on this basis.  In his third independent claim, Velasquez argues the evidence was insufficient to support a finding he possessed a firearm for purposes of his conviction for possession of a firearm by a felon under section 29800(a)(1).  We reject these contentions.

### A.

As explained above, when reviewing for substantial evidence, we review the record in the light most favorable to the judgment to determine whether a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  (*Jackson*, 443 U.S. at p. 319; *Collins*, 17 Cal.5th at p. 307.)

### B.

"[A] person who aids and abets a crime is guilty of that crime even if someone else committed some or all of the criminal acts." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117.)  First degree murder under an aiding and abetting theory requires a showing "that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission." (*Hin*, 17 Cal.5th at p. 445 [cleaned up].)  To be liable for murder as an aider and abettor, "the aider and abettor must know and share the murderous intent of the actual perpetrator." (*McCoy*, 25 Cal.4th at p. 1118.)  Mere presence at the scene of a crime or knowledge of, but failure to prevent it, cannot establish aiding and abetting liability, but relevant factors include presence at the scene of the crime, companionship, and conduct before and after the offense.  (*People v. Campbell* (1994)

23

25 Cal.App.4th 402, 409.) "'Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction.'" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055.)

The evidence at trial showed Velasquez and Barbarin were members of Eastside Riva, a gang embroiled in a bitter rivalry with the 1200 Blocc Crips. Velasquez had a tattoo suggesting he kills members of the 1200 Blocc Crips, and his gang moniker appeared near graffiti declaring "hunting season" on members of the rival gang. In addition, he had a close personal relationship with Barbarin, who had a history of murdering members of the 1200 Blocc Crips and had personal animus toward the rival gang because they murdered his cousin.

At the time of the shooting, Velasquez was driving his car in an area claimed by both Eastside Riva and the 1200 Blocc Crips. Barbarin was in the passenger seat and armed with a gun. They came upon Simmons, whom they mistook for a 1200 Blocc Crips member. Velasquez slowed or stopped so Barbarin could get out. Velasquez waited while Barbarin shot Simmons and got back into the car. After the shooting, Velasquez said, "ey fool, like reload that shit and let, let me go too" and they could "just keep going all night."

Viewing this evidence in the light most favorable to the judgment, a reasonable juror could conclude Velasquez aided and encouraged Barbarin in the commission of Simmons' murder. A reasonable juror also could find Velasquez knew, based on his relationship with Barbarin, that Barbarin's purpose was to murder Simmons. Lastly, a reasonable juror could find Velasquez had both the intent to murder and the purpose of committing,

encouraging, or facilitating Barbarin's commission of the murder. (See *Hin,* 17 Cal.5th at p. 456; *Nguyen*, 61 Cal.4th at p. 1055.)

Because we find the evidence sufficient to support Velasquez's first degree murder conviction, we further find the trial court did not error by denying his motion for judgment of acquittal under section 1118.1. (*People v. Dalton* (2019) 7 Cal.5th 166, 249 [trial courts apply same standard in ruling on motion under section 1118.1 as appellate courts apply in conducting sufficiency of evidence review].)

C.

A person is guilty of violating section 29800(a)(1) if he or she (1) was previously convicted of a felony and (2) "owns, purchases, receives, or has in possession or under custody or control any firearm." "Possession may be physical or constructive . . . [and] may be imputed when the contraband is found in a place which is immediately accessible to the joint dominion and control of the accused and another." (*People v. Miranda* (2011) 192 Cal.App.4th 398, 410.)

Velasquez contends the evidence did not show he ever possessed a firearm, so the jury convicted him vicariously because Barbarin used one to commit the crime. But we find substantial evidence supports Velasquez's conviction on this charge because it showed he both actually and constructively possessed a firearm. A reasonable juror could find Velasquez *actually* possessed a firearm based on evidence Barbarin gave the murder weapon to Velasquez after the shooting and Velasquez had gunshot residue on his hand. And evidence a firearm was inside Velasquez' car while he was present is sufficient for a reasonable juror to find him in *constructive* possession of it. (*Miranda,* 192 Cal.App.4th at p. 410.)

## VII.

### A.

In his fourth independent claim, Velasquez appears to argue the trial court erred under Evidence Code section 352 by admitting Barbarin's statements to the informants and all the gang evidence against Velasquez because it was more prejudicial than probative. His main contention, however, is that admission of Barbarin's statements violated Velasquez's (1) Fifth, Sixth, and Fourteenth Amendment rights to due process and a fair trial and (2) Eighth Amendment right to a reliable determination of the facts because the evidence was unduly prejudicial and opened the door to the gang evidence.

Before trial, Velasquez moved to exclude Barbarin's statements, arguing their admission would violate state evidentiary rules and Velasquez's Fifth and Sixth Amendment rights to due process and confront witnesses. He further argued his Eighth Amendment right to a reliable determination of the facts in a death penalty case required heightened scrutiny of the admissibility issues. And he argued the gang evidence and Barbarin's statements should be excluded under section 352 as more prejudicial than probative.

The trial court ruled Barbarin's statements were (1) nontestimonial and thus did not violate Velasquez's confrontation rights and (2) otherwise admissible because they fell within a hearsay exception. As to Velasquez's Eighth Amendment argument, the court recognized the need for "higher scrutiny" in this death penalty case but stood by its ruling. Lastly, the court ruled the gang evidence was admissible under section 352 as more probative than prejudicial and admitted Barbarin's statements subject to redactions responsive to Velasquez's objections.

26

B.

We review claims regarding the admission of evidence for abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 723.) We assess the court's exercise of discretion to determine whether it acted in an arbitrary, capricious, or patently absurd manner. (*People v. Jones* (2013) 57 Cal.4th 899, 947.) Trial courts must be afforded broad discretion to determine whether particular evidence is more prejudicial than probative. (*People v. Flinner* (2020) 10 Cal.5th 686, 718.)

Under section 352, a trial court may exclude even relevant evidence if it finds "its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Evidence is unduly prejudicial if it "'uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.'" (*People v. Karis* (1988) 46 Cal.3d 612, 638.) "In other words, evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction." (*People v. Branch* (2001) 91 Cal.App.4th 274, 286 [cleaned up].)

Here, Velasquez has not shown the trial court abused its discretion by finding the challenged evidence not inadmissible under section 352. Barbarin's statements and the gang evidence were directly relevant to establishing Velasquez's involvement in the murder and his liability for the gang-related charges. Thus, despite Velasquez's suggestion that his joint trial with Barbarin "opened the door" to this evidence, he has not shown the challenged evidence would have been excluded had he been tried separately.

27

Nor was this evidence unduly prejudicial simply because it was incriminating. Accordingly, the trial court's admissibility determination was not arbitrary or capricious.

C.

It is "rare and unusual" for the admission of evidence to violate a defendant's federal constitutional right to due process. (*People v. Albarran* (2007) 149 Cal.App.4th 214, 232.) "'Only if there are no permissible inferences'" to be "'draw[n] from the evidence can its admission violate due process. Even then, the evidence must "be of such quality as necessarily prevents a fair trial."'" (*Id.* at p. 229.)

Velasquez does not appear to argue here, as he did in the trial court, that Barbarin's statements (1) were inadmissible hearsay or (2) violated Velasquez's constitutional right to confront witnesses. Nor could he. Barbarin's statements against penal interest were not inadmissible hearsay. (Evid. Code, § 1230.) In addition, because Barbarin's statements were nontestimonial, their admission did not violate Velasquez's confrontation rights. (*People v. Gallardo* (2017) 18 Cal.App.5th 51, 67–68.) And, as already discussed, the trial court did not err by admitting the evidence over Velasquez's section 352 objections.

Having been properly admitted, the jury could infer from Barbarin's statements and the gang evidence that Velasquez aided and abetted Barbarin in the commission of first degree murder and did so for the benefit of Eastside Riva. Because the jury could have drawn permissible inferences from the challenged evidence, its admission did not violate due process.

VIII.

In his fifth independent claim, Velasquez asserts the trial court erred by instructing the jury he could be convicted of murder based on a finding of implied malice.  We disagree.

A.

Preliminarily, the People contend Velasquez forfeited this claim of instructional error by failing to object or request clarifying language at trial. Yet a claim of instructional error that affects the defendant's substantial rights is not forfeited by failure to object (*People v. Anderson* (2007) 152 Cal.App.4th 919, 927; § 1259), and "[a]scertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim" (*People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249).  We thus proceed to the merits.

B.

The trial court instructed the jury on aiding and abetting principles under CALCRIM Nos. 400 and 401.  As relevant here, CALCRIM No. 401 instructed the jury a defendant is guilty of a crime as an aider and abettor where the defendant "knows of the perpetrator's unlawful purpose" and "intends to and does, in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime."  The court then instructed the jury on first degree murder and the lesser included offenses of second degree murder and voluntary manslaughter.  Importantly, the court instructed the jury under CALCRIM No. 521 that "[t]he defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation" and that "[t]he defendant acted willfully if he intended to kill."  The court further instructed the jury under CALCRIM Nos. 520 and 521 that if it found Velasquez committed murder, but the prosecution had not

29

proven beyond a reasonable doubt it was murder in the first degree, Velasquez was guilty of second degree murder.

## C.

We review claims of instructional error de novo. (*People v. Guiuan* (1998) 18 Cal.4th 558, 569.) "In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case." (*Martinez,* 47 Cal.4th at p. 953.) "'[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.'" (*People v. Carrington* (2009) 47 Cal.4th 145, 192.)

## D.

Velasquez argues the trial court's jury instruction under CALCRIM No. 520 that murder is an unlawful killing committed with express or implied malice conflicted with other instructions informing the jury it could convict Velasquez of first degree murder as an aider and abettor only if it found he harbored an intent to kill. According to Velasquez, this conflict allowed the jury to convict him of first degree murder based on a finding of implied malice alone. He further argues that, because the conflicting instructions allowed the jury to convict him on an invalid implied malice theory, they violated his right to due process.

We find no conflict, let alone a conflict that allowed the jury to convict Velasquez of first degree murder as an aider and abettor without finding he harbored the specific intent to kill. Although CALCRIM No. 520 defines murder generally as requiring either express or implied malice, the remaining instructions informed the jury that, to find Velasquez guilty of

first degree murder as an aider and abettor, it was required to find Velasquez specifically intended to kill.

To the extent Velasquez asserts a federal due process violation based on an allegation the instructions permitted the jury to return a general verdict potentially based on an invalid legal theory, we reject his argument. The jury was neither instructed with an invalid legal theory nor did it return a general verdict. It returned a verdict of first degree murder based on proper instructions that such a conviction under an aiding and abetting theory required the jury to find Velasquez intended to kill.

## IX.

Lastly, Velasquez contends the abstract of judgment should be corrected to reflect he and Barbarin are jointly and severally liable for victim restitution. The People do not concede error but acknowledge we "can and should ensure that corrected abstracts of judgment be prepared."

At sentencing, the trial court ordered Velasquez and Barbarin to pay victim restitution "jointly and severally" in the amount of $5,000 to California's Victim Compensation Board. The abstracts of judgment reflect restitution in the amount of $5,000 but do not specify Velasquez and Barbarin are jointly and severally liable. Accordingly, the abstracts of judgment shall be amended.

## DISPOSITION

We reverse the true finding on the hate-crime special circumstance allegation under section 190.2(a)(16) against Velasquez and strike it from the judgment. We remand for the trial court to amend the abstracts of judgment to reflect the restitution obligation of both Velasquez and Barbarin is joint and several. The trial court shall forward certified copies of the amended

31

abstracts of judgment to the Department of Corrections and Rehabilitation. In all other respects, we affirm.

CASTILLO, J.

WE CONCUR:


O'ROURKE, Acting P. J.


KELETY, J.